No. 24-11100

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

APM Terminals Mobile, LLC,

*Plaintiff-Appellee,*

v.

International Longshoremen's Association, Local 1410,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of Alabama, Southern Division
Case No. 1:23-cv-00332-C – William E. Cassady,
United States Magistrate Judge, Southern District of Alabama

_____

## APPELLEE'S BRIEF

_____

Anne Laurie McClurkin
Mary Anna Brand
MAYNARD NEXSEN PC
RSA Battle House Tower
11 North Water Street, Suite 24290
Mobile, Alabama 36601
Telephone: (251) 432-0001
Email:  amcclurkin@maynardnexsen.com
        mbrand@maynardnexsen.com

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellee certifies that the following is a complete list of the persons and entities who have an interest in the outcome of this case:

1. A P Moller – Maersk A/S, parent company of Appellee APM Terminals Mobile, LLC;

2. APM Terminals Mobile, LLC, Appellee;

3. Brand, Mary Anna, counsel for Appellee

4. Cassady, William E., United States Magistrate Judge for the United States District Court in the Southern District of Alabama;

5. Davies, George N., counsel for Appellant;

6. International Longshoremen's Association, Local 1410, Appellant;

7. Maynard Nexsen PC, law firm of counsel for Appellee;

8. McClurkin, Anne Laurie, counsel for Appellee;

9. Quinn, Connor, Weaver, Davies, & Rouco LLP- law firm of counsel for Appellant; and

10. Rouco, Richard P., counsel for Appellant.

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Additionally, pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, 26.1-3, and 28-1(b), and Federal Rule of Appellate Procedure 26.1, Appellee certifies that it is an indirect wholly-owned subsidiary of A P Moller – Maersk A/S, which is publicly listed on the Copenhagen NASDAQ under the symbol AMKBY. The undersigned counsel for Appellee certifies Appellee's web-based certification providing Appellee's stock ticker symbol has been completed via the Court's website.

## STATEMENT REGARDING ORAL ARGUMENT

Appellee APM Terminals Mobile, LLC ("APM") respectfully submits that, at least with respect to the merits of the appeal, the issues the Court will decide are neither novel nor so complex that oral argument should be necessary.  As explained further herein, APM has challenged the Court's jurisdiction, and APM's motion to dismiss Appellant International Longshoremen's Association, Local 1410's ("Local 1410") interlocutory appeal is pending before the Court.  Oral argument on the jurisdictional issue may be useful because, on information and belief, APM's motion to dismiss raises issues that have not been authoritatively decided in this Circuit, but the same cannot be said for deciding the appeal on its merits.  Determining whether the District Court properly denied Local 1410's motion seeking to compel arbitration will require analyzing the District Court's interpretation of the straightforward contract language at issue and its application of settled principles of contract construction.  Neither implicates issues that have not been authoritatively decided nor facts and/or legal issues that cannot be adequately addressed in the parties' briefing.  *See* Fed. R. App. P. 34(a)(2); 11th Cir. R. 34-3(b).

In sum, while APM does not believe oral argument will enhance the parties' written arguments in any significant fashion, to the extent the Court believes oral argument may aid the process for deciding any of the pending issues, APM welcomes the opportunity.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ................................................. i

CORPORATE DISCLOSURE STATEMENT ................................................ ii

STATEMENT REGARDING ORAL ARGUMENT .................................... iii

TABLE OF CONTENTS.................................................................... iv

TABLE OF AUTHORITIES ............................................................ vi

    I.    STATEMENT OF JURISDICTION ................................................. 1

    II.    STATEMENT OF THE ISSUES ..................................................... 3

    III.    STATEMENT OF THE CASE ......................................................... 4

        A. Nature of the Case and Procedural History ................................. 4

        B. Statement of Facts ....................................................... 6

            1. APM and Local 1410 ................................................ 6

            2. The Collective Bargaining Agreement ................................... 6

            3. Local 1410's Work Stoppage in August 2023 ........................ 11

        C. Standard of Review ....................................................... 12

    IV.    SUMMARY OF ARGUMENT.......................................................... 12

V.    ARGUMENT ...................................................................    17

    A. The District Court Properly Refused to Apply the "Presumption" Favoring Arbitration because the CBA Is Unambiguous and Moreover, the LMRA and Federal Labor Policy Only "Favor" Settling Disputes through the Method Agreed to by the Parties ...............................................    17

    B. The District Court Correctly Applied the First *Steelworkers Trilogy* Principle and Appropriately Rejected Local 1410's Unreasonable CBA Interpretation................................    20

        1.    Based on the plain language of the CBA, APM's claims and the Article 4 conditions are not subject to the Article 5 grievance and arbitration procedure ..............................    20

        2.    Local 1410's arguments on appeal neither change the analysis nor require a different result ...............................    24

    C. The District Court Correctly Declined to Apply the Presumption Favoring Arbitration, but Even If It Is Applied, the Presumption Has Sufficiently Been Rebutted ...................................    34

VI.    CONCLUSION ................................................................    38

CERTIFICATE OF COMPLIANCE................................................    40

CERTIFICATE OF SERVICE .......................................................    40

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                    **<u>Page No.</u>**

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986) .......... 18, 19

*Drake Bakeries, Inc. v. Lock 50, Am. Bakery & Confectionery*
   *Workers Int'l, AFL-CIO*, 370 U.S. 254 (1962) ......................................37

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)...................... 19, 21

*Freidrich v. Local Union No. 780, IUE-AFL-CIO-CLC,*
   515 F.2d 225 (5th Cir. 1975) ...................................................24

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010)................. 19, 21

*Indep. Oil Workers at Paulsboro, N.J. v. Mobil Oil Corp.*,
   441 F.2d 651 (3d Cir. 1971) ...................................................30

*ITT World Commc'ns, Inc. v. Commc'ns Workers of Am.*,
   422 F.2d 77 (2d Cir. 1970) ...................................................37

*Jackson v. Bank of Am., N.A.*, 898 F.3d 1348 (11th Cir. 2018)...............................37

*Kwok v. Delta Air Lines Inc.*, 578 F. App'x 898 (11th Cir. 2014) ..........................35

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v.*
   *City of Jacksonville, Fla.*, 896 F.2d 1283 (11th Cir. 1990).................................25

*Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054
   (11th Cir. 1998).................................................................35

*Pilot Freight Carriers Inc. v. Local 391, IBT,* 659 F.2d 1252
   (4th Cir. 1981)................................................... 30, 31, 32, 33

*Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters,*
   *Chauffeurs, Warehousemen & Helpers of Am.*, No. 77-1704,
   1977 WL 27517 (4th Cir. Sept. 2, 1977) .............................................31

*Pueblo of Isleta v. Grisham*, 2019 WL 1429586 (D.N.M Mar. 30, 2019) .............30

*Romano v. John Hancock Life Ins. Co. (USA),* 120 F.4th 729
  (11th Cir. 2024)............................................................................................... 15, 23

*United Steel, Paper & Forestry, Rubber,Mfg., Energy, Allied Indus.*
  *& Serv. Workers Int'l Union v. Wise Alloys, LLC*, 807 F.3d 1258
  (11th Cir. 2015)....................................................................................................12

*United Steelworkers v. Warrior & Gulf Nav. Co*., 363 U.S. 574 (1960)................31

*United Steelworkers of Am., AFL-CIO-CLC v. Lukens Steel Co.*
  969 F.2d 1468 (3d Cir. 1992) ....................................................................... 27, 28

**Statutes**                                          **Page No.**

9 U.S.C.A. § 16.......................................................................................................1

28 U.S.C.A. § 1291 .................................................................................................2

29 U.S.C.A. § 173(d) .............................................................................................17

29 U.S.C.A. § 185 ...................................................................................................4

# I.    STATEMENT OF JURISDICTION

APM's jurisdictional challenge has been fully briefed in APM's Motion to Dismiss for Lack of Jurisdiction and its Reply in Support of the Motion to Dismiss (Docs. 21 and 29).    For the Court's convenience, APM has summarized its jurisdictional arguments below, but to avoid belaboring or repeating its prior briefing, APM adopts and incorporates said briefing as if set forth fully herein.

Following the District Court's denial of Local 1410's Motion to Dismiss and Compel Arbitration (the "Motion," Doc. 16 pp. 251 – 263), Local 1410 filed this appeal, and later, in its principal brief, identified the Federal Arbitration Act, 9 U.S.C.A. § 16 ("FAA") as the basis for appellate jurisdiction.[1]    (Doc. 15 p. 10). Thereafter, APM filed its Motion to Dismiss for Lack of Jurisdiction (Doc. 21), outlining the numerous reasons why the FAA does not apply and otherwise, illustrating why the exercise of appellate jurisdiction under the present circumstances is procedurally improper.

In response, Local 1410 conceded that the FAA's appellate provisions are inapposite.  (Doc. 28 p. 5).  Local 1410 now urges the Court to apply the collateral order doctrine, and in doing so, to set aside a century's worth of procedural precedent

---

[1]    Unless otherwise indicated, citations are to the Eleventh Circuit docket or Local 1410's Appendix filed as Eleventh Circuit document number 16.  Page citations to the docket are to the Pacer PageID#.  Page citations to the Appendix (Doc. 16) are to the record page number shown in black at the top center header of each page.

and hear the appeal anyway.  (*Id.*).  Alternatively, Local 1410's Response argues the Court should create jurisdiction, either by borrowing the FAA's appellate provisions or by creating an exception to the finality requirement under 28 U.S.C.A. § 1291. (*Id.*).  APM's Reply in Support of the Motion to Dismiss (Doc. 29) outlines the reasons the Court should decline Local 1410's invitations and establishes:

1.    Application of the collateral order doctrine would violate settled law preserving the collateral order doctrine for sufficiently important matters of public concern that cannot be effectively reviewed on appeal after final judgment;

2.    Since 28 U.S.C.A. § 1291 clearly is the operative appellate statute, "borrowing" the FAA's appellate provisions is neither proper nor necessary; and

3.    Creating an exception to the finality requirement in 28 U.S.C.A. § 1291 would exceed the Court's authority both under Section 301 of the Labor Management Relations Act ("LMRA") and Eleventh Circuit precedent.

(*Id.*)

## II.    STATEMENT OF THE ISSUES

1.    Whether the District Court properly declined to compel arbitration of a dispute concerning Local 1410's violation of a no-strike provision that, based on the plain language of the parties' collective bargaining agreement ("CBA"), is expressly excluded from the separate mandatory grievance and arbitration clause applicable to other disputes?

2.    Whether the District Court properly applied settled principles of contract construction to determine the parties' intent and the meaning of the language in Article 4 of the CBA expressly authorizing judicial action for disputes alleging violation of the no-strike provision, thereby rejecting the unreasonable interpretation of the CBA advanced by Local 1410?

3.    Whether the District Court correctly determined application of the presumption favoring arbitration was neither necessary nor appropriate since Article 4 of the CBA unambiguously permits disputes over an alleged violation of the no-strike clause to proceed in court?

4.    Assuming, *arguendo*, the rebuttable presumption favoring arbitration should be applied (it should not), whether the District Court's Order (the "Order") should nonetheless be affirmed under the "right for any reason" doctrine because APM's submission to the District Court successfully rebutted the presumption?

3

### III.    STATEMENT OF THE CASE

A.    **Nature of the Case and Procedural History**

The District Court's denial of Local 1410's Motion confirms the longstanding rule that a party cannot be forced to arbitrate a dispute that it did not agree to submit to arbitration.  On August 28, 2023, APM filed suit in the Circuit Court of Mobile County, Alabama in line with the CBA's injunctive relief provisions and seeking a declaration of the parties' rights and obligations concerning Local 1410's alleged breach of the "no strike or lockout" provision based on Local 1410's August 28 – 30, 2023 work stoppage.  APM simultaneously sought a temporary restraining order ("TRO") to enjoin Local 1410 from any further strike activity.  (Doc. 16 pp. 21 – 60).  On August 29, 2023, the Circuit Court entered the TRO.  However, it was nearly two full workdays before the work stoppage ended so that operations could resume.  (Doc. 16 pp. 61 – 63).

On August 30, 2023, Local 1410 removed the case to the United States District Court for the Southern District of Alabama under Section 301 of the Labor Management Relations Act ("LMRA").  29 U.S.C.A. § 185.  (Doc. 16 pp. 65 – 67).  After APM had sufficient time to quantify the monetary losses it suffered from the delay and disruption caused by Local 1410's unauthorized strike, on November 21,

4

2023, APM filed its Amended Complaint, adding a claim for damages.[2]  (Doc. 16 pp. 98 – 115).  Thereafter, Local 1410 filed its Motion.  Local 1410's Motion argues that, pursuant to "federal labor policy favoring arbitration," the grievance and arbitration language in Article 5 of the CBA overrides the preceding plain and unambiguous language in Article 4 creating an exception for disputes alleging violation of the no-strike provision and allowing either party to file for damages in court.  (Doc. 16 pp. 185 – 200).  After the Motion was fully briefed and following oral argument, the District Court entered a non-final order denying Local 1410's Motion in its entirety.  (Doc. 16 pp. 208 – 228 (APM's Response); Doc. 16 pp. 234 – 249 (Local 1410's Reply); District Court Doc. 33 (Oral Arg. Transcript); Doc. 16 pp. 251 – 263 (District Court's Order)).

Local 1410 subsequently filed this interlocutory appeal (Doc. 16 pp. 265 – 267), and on September 26, 2024, Local 1410 filed its principal brief (the "Brief" Doc. 15).  On October 31, 2024, APM filed its Motion to Dismiss Local 1410's interlocutory appeal for lack of jurisdiction.  (Doc. 21).  Thereafter, APM filed an unopposed request to stay further briefing on the merits of the appeal pending resolution of the jurisdictional challenge (Doc. 26), which this Court granted on November 18, 2024.  (Doc. 27).  However, on January 15, 2025, the Court instructed

---

[2]    Prior to filing its Amended Complaint, APM filed an Unopposed Motion for Leave to Amend, which the District Court granted.  (Doc. 16 pp. 75 – 82).

that APM's Motion to Dismiss would be carried with the case and the jurisdictional issue would be addressed with the merits of the appeal and instructed APM to file its principal brief by February 14, 2025. (Docs. 30 and 32).

**B.    Statement of Facts**

**1.    APM and Local 1410**

APM is engaged in stevedoring and marine terminal operations to effectuate the loading and discharge of containerized cargo in the Port of Mobile in Mobile, Alabama (the "Port"). (Doc. 16 p. 98). Local 1410 is a local union that represents longshore employees who perform work for APM. (Doc. 16 pp. 98 – 99). APM relies on the longshore employees to move and transport shipping containers coming in and out of the Port around APM's facilities and to the rail facility at the Port via trucks and other equipment. (Doc. 16 pp. 99 – 100). Local 1410 is comprised mostly of drivers, and since transporting cargo to the rail facility requires travel on city roads, rail cargo drivers are required to have a commercial driver's license ("CDL"). Thus, without an adequate number of qualified CDL drivers, APM's rail cargo operations cease entirely. (Doc. 16 pp. 99 – 100, 105).

**2.    The Collective Bargaining Agreement**

All of the work Local 1410 members perform for APM is governed by a local CBA, which the parties executed on April 27, 2020. The CBA was in effect at all times relevant to this dispute. (Doc. 16 pp. 101 – 102).

Article 4 of the CBA is the "**NO STRIKE OR LOCKOUT**" provision ("Article 4" or "no-strike provision") that expressly prohibits strikes or work stoppages for any reason.  Article 4 further provides that in the event of an **alleged** violation of the no-strike provision, either party may file judicial action to: (1) immediately seek injunctive relief; and/or (2) seek monetary damages after satisfying three conditions.  In its entirety, Article 4 provides as follows:

### ARTICLE 4. NO STRIKE OR LOCKOUT

During the term of this Agreement, the Employer agrees that there shall be no lockout of the employees represented by the Union at its operations, and the Union agrees that there shall be no strike, sympathy strike, sit down, walkout, suspension of work, curtailment or limitation of production, slowdown, picketing or any other total or partial interference with or stoppage of the Employer's operations for any cause whatsoever, including without limitation any alleged unfair labor practices by the Employer or any alleged violations of this Agreement by the Employer.

In the event of strike or other action proscribed above, **the Union shall immediately take affirmative action allowed by law in an effort to prevent or terminate such violation** of this Agreement.

If an individual employee or a group of employees engage in action in violation of this Article and, in the judgment of Employer, work can efficiently continue, only the employee(s) engaging in such action shall be released with no guarantees applying.  However, if the Employer determines that work cannot continue efficiently while replacements are sought, the Employer may release all employees without pay beyond time actually worked.

Employees who engage in conduct that violates this Article shall be subject to disciplinary action by the Employer.  An employee or employees who violate this Article may be suspended from eligibility for hire for fifteen (15) days for a first offense and for thirty (30) days for a second offense occurring during the term of

7

this Agreement and will be disqualified permanently from eligibility for hire for a third offense during the term of this Agreement.

If any action occurs, **which either party asserts is a violation of this Article**, the party asserting the alleged violation **shall not institute any judicial or administrative action against the other for damages until:**

    a. <u>notice</u> of such alleged violation has been provided to the other party;

    b. the party receiving such notice <u>fails to initiate and complete a prompt investigation</u> on whether such action is a violation of this Article; and

    c. such party <u>fails to undertake prompt affirmative action</u> as required under this Article.

**This provision shall not preclude either party from immediately seeking equitable relief, including injunctive relief and declaratory, to remedy any violation of this Article.**

(Doc. 16 pp. 118 – 119) (emphasis added).

The following section of the CBA is the "**DISPUTES AND ARBITRATION**" provision ("Article 5" or "grievance and arbitration provision"). Article 5 outlines the procedure for resolving all other work-related disputes or alleged violations of the CBA and is consistent with the parties' clear objective to avoid prohibited strike activity. Article 5 provides in relevant part:

## <u>ARTICLE 5. DISPUTES AND ARBITRATION</u>

All grievances or disputes arising from the application, interpretation or alleged violation of this Agreement ("grievance") shall be settled by the following procedure, and there shall be no strike or other proscribed action as defined under **Article 4** of this Agreement at any time.

8

Except as provided under the **"Step lA (Expedited Hearing Procedure),"** the party submitting the grievance ("the grievant") shall deliver a written grievance to the authorized representative of the other party within five (5) business days of the date the grievant knew or reasonably should have known of the act or failure to act giving rise to the grievance. … The written grievance should: (i) state the date of the alleged act or failure to act giving rise to the grievance; (ii) reasonably describe the facts giving rise to the grievance and identify the Agreement provisions that apply to the grievance; and (iii) be signed by an authorized representative of the grievant; provided the failure to comply strictly with foregoing requirements for "the written grievance" shall not relieve either party of the obligation to process the grievance under **Article 5** through arbitration if requested. Upon submission of the written grievance, the grievant may request the opportunity to seek an informal resolution of the grievance. If the grievance is not resolved by the Employer and the Union within forty-eight (48) hours after the grievant delivers a timely written grievance to the other party, the grievance shall proceed to **Step 1.**

**Step 1. Step 1** is a hearing before a Grievance Committee consisting of two representatives of the Employer and two representatives of the Union. The hearing shall be held within a reasonable time after delivery of the written grievance. The Employer and the Union shall be bound by a unanimous decision of the Grievance Committee.

**Step 1 A. (Expedited Hearing Procedure):** If Employer imposes a disciplinary suspension without pay, termination, or a disciplinary determination that an employee is ineligible for hire, including permanent ineligibility for hire, upon receipt of written notice from Employer stating the proposed disciplinary action, the Union may *within three (3) business days* deliver to the Employer a verbal or written request for an expedited Grievance Committee hearing under **Step 1.** If the Union timely delivers such a request, the hearing before the Grievance Committee shall be held *within three (3) business* days thereafter, and the proposed discipline will not be imposed until completion of the hearing before the Grievance Committee, *unless* the Grievance Committee hearing is postponed or delayed at the request of the Union or as a result of any action by the Union. If the grievance is

9

not resolved at the expedited hearing by unanimous decision of the Grievance Committee, Employer may in its sole discretion impose the discipline and any timely grievance on the discipline shall proceed to **Step 2** of this **Disputes and Arbitration** provision. ***Provided,*** Employer may impose the discipline immediately if, in the judgment of the Employer, the disciplinary action is imposed for a safety violation that endangered the health or safety of the employee or others or that resulted in significant property damage, for a threatened or actual violent act, or for a violation of the **Drug and Alcohol Policy and Program in Article 5.**

If the Union does not timely deliver to the Employer a request for expedited **Step 1A** hearing, the Employer may impose discipline and any grievance on the disciplinary action shall be subject to the established procedures and time limitations under the **Grievance and Arbitration** provision without regard to the **Expedited Hearing Procedure.**

\* \* \*

**Arbitration.** If arbitration is timely requested, the Federal Mediation and Conciliation Service shall be requested to submit a panel of seven (7) disinterested persons who are qualified and willing to act as arbitrator. From that list, the parties shall within ten (10) workdays after receipt of the list, alternatively strike the name of one individual from the list (the first strike shall be determined by the toss of a coin) until one individual remains, who shall be the arbitrator. The arbitrator shall hear the grievance as soon as practical after selection and shall endeavor to render a decision in writing within thirty (30) days after conclusion of the arbitration hearing. Employees represented by the Union shall be released from work with pay to appear as witnesses upon request by either party. The party requesting the employee shall be responsible for their pay. The decision of the arbitrator shall be final and binding on the parties. The expenses of arbitration shall be borne equally by the Employer and the Union.

The arbitrator's decision shall be limited to the interpretation and application of the terms of this Agreement. The function and purpose of the arbitrator is to resolve any disputed interpretation or application of the terms in this Agreement and to determine the

10

relevant facts upon which the interpretation or application of the terms of this Agreement depend. The arbitrator shall not address in his or her decision any issue not submitted for arbitration. The arbitrator shall not have authority to decide or to interpret this Agreement in a way that would change the intent of the parties as determined by generally accepted rules of contract construction. The arbitrator shall not render any decision that, in practical or actual effect, modifies, revises, detracts from or adds to any of the terms of this Agreement. Past practice of the parties may be considered as relevant evidence in interpreting or applying the terms of this Agreement, but may not be applied to justify or result in what is in effect a modification (whether by addition or deletion) of the terms of this Agreement. The arbitrator shall not render any decision or award merely because, in the arbitrator's opinion, such decision or award is fair or equitable.

(Doc. 16 pp. 119 – 122).

### 3.    Local 1410's Work Stoppage in August 2023

At the beginning of the August 28, 2023 morning shift, a Local 1410 driver used the two-way radio system to direct other Local 1410 members to exit their work trucks and stop all work, leaving APM with no drivers for the first shift or the quickly approaching second shift. (Doc. 16 pp. 103 – 104). Pursuant to Article 4, APM immediately sought injunctive relief, and the TRO was issued the morning of August 29, 2023. (Doc. 16 pp. 21 – 60). However, notwithstanding the TRO's directive, requiring Local 1410 leaders to take affirmative action to ensure its local members promptly returned to work, and numerous requests from APM management to Local 1410 leadership, Local 1410 took no affirmative action and the work stoppage

continued through August 30, 2023.[3]  APM's normal operations resumed on August

31, 2023.  (Doc. 16 pp. 105 – 110).  As such, after APM satisfied the Article 4

conditions and finalized its quantification of monetary damages, APM amended its

Complaint to seek damages for the August 2023 strike in line with Article 4's clear

and unambiguous exclusion.  (Doc. 16 pp. 98 – 115).

## C.    <u>Standard of Review</u>

The standard of review is de novo. *United Steel, Paper & Forestry, Rubber,*

*Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Wise Alloys, LLC*, 807

F.3d 1258, 1266 (11th Cir. 2015).

## IV.    SUMMARY OF ARGUMENT

The LMRA sets the bargaining baseline and merely requires parties to create

a system of dispute resolution to settle disputes between them.  The LMRA also

requires courts to interpret and enforce the dispute resolution systems outlined in a

CBA as expressly written and agreed to by the parties.  CBA parties, however, are

free to bargain for and choose any method of dispute resolution, and the LMRA

simply does not require the parties to select grieving and arbitrating disputes as their

---

[3]     Local 1410 acknowledged to the District Court that some form of work stoppage occurred (District Court Doc. 33 p. 9:17 – 23), but Local 1410 denies that it was an actual strike or that Local 1410 is responsible for the labor stoppage and shortages occurring on August 28-30, 2023.  However, as the no-strike provision confirms, a party need only *allege* that an Article 4 violation occurred to invoke Article 4's provisions permitting judicial relief.  Accordingly, Local 1410's version of the events is inapposite to this appeal.  *See* Doc. 15 p.  15.

12

sole, preferred, or primary method of dispute resolution.  The applicable Supreme Court precedent, decided subject to the LMRA's express language and Congress's manifest intent therein, confirms as much in that a court may not force a party to arbitrate a claim the party did not agree to resolve by arbitration.

Put differently, "federal labor policy" does not "favor" any particular method of dispute resolution.  What it "favors" is holding the parties to the method they have collectively chosen – arbitration, judicial, or otherwise – for the specific issue in dispute.  And, barring the parties' clear consent to arbitration it also does not override, diminish, or take precedence over the plain CBA language permitting resolution of Article 4 disputes via judicial actions for injunctive and/or monetary relief.  For the same reasons, any such policy cannot possibly require reversal of the District Court's Order declining to compel arbitration of a dispute alleging a violation of the no-strike provision based on the clear and unambiguous language in Article 4 of the CBA permitting APM's suit in the judicial forum.

In reaching its decision, the District Court followed the *Steelworkers Trilogy* principles and the Supreme Court's guidance instructing that a court's premier duty in determining arbitrability is to interpret the CBA as a whole based on its plain and ordinary meaning through the lens of the well-settled principles of contract construction.  The District Court concluded that Article 5, when read in isolation, is broad, but when read in the context of the full agreement, in particular the

13

immediately preceding Article 4, there is only one reasonable interpretation and only one interpretation that gives effect to both provisions: Article 4 expressly excludes from Article 5, or, at a minimum, creates an alternative dispute resolution system for, disputes alleging violations of the no-strike clause. There is no other logical interpretation of the CBA, generally or the language in Article 4 specifically, and Local 1410 has failed to identify any reversible error by the District Court.

The accuracy and appropriateness of the District Court's interpretation of the CBA is supported by Article 4's plain language confirming not only that a party may seek recourse for an alleged Article 4 violation in court, but also the agreed-upon timing and procedure for pursuing judicial relief. While Article 4(a)-(c) identifies certain basic conditions (e.g., notice to the other party) that must be satisfied prior to filing a claim for monetary damages, missing from Article 4(a)-(c) is any language requiring the parties to *first* grieve and arbitrate whether the conditions have been satisfied prior to filing suit. Moreover, while Local 1410 points to the purported universal applicability of Article 5, the accuracy of Local 1410's interpretation is belied by other CBA provisions expressly identifying the specific disputes that are "subject to" the grievance and arbitration procedure in Article 5. (*See* Doc. 16 pp. 128, 145, 150 – 151, 155). The references throughout the CBA identifying the disputes to which Article 5 applies establishes the parties did not intend for Article 5 to apply universally or to every dispute. To hold otherwise would render each of

14

these specific references superfluous.  *See  Romano v. John Hancock Life Ins. Co. (USA),* 120 F.4th 729, 742 (11th Cir. 2024) (federal courts interpret contractual terms by "presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous"; finding contract at issue must be "[r]ead as a whole and in the context of its directly preceding provisions.") (first internal quotation omitted).  Had the parties intended to grieve and arbitrate disputes arising under the no-strike provision, Article 4 would include the same language indicating Article 5's applicability.  Tellingly, Article 4 contains no such indication.

The District Court's denial of Local 1410's invitation to apply the alleged "presumption favoring arbitration" was proper considering the District Court did not find any ambiguities, uncertainties, or language supporting Local 1410's reading of the CBA.[4]  The presumption under the *Steelworkers Trilogy* cannot be applied where, as here, the CBA plainly answers the arbitrability question.  Indeed, there absolutely is no need to assume the parties intended to arbitrate APM's claims or the

---

[4]    As noted, *supra*, at p. 13, and for the reasons explained more fully, *infra*, at § V (A), Local 1410's argument that federal labor policy includes a presumption favoring arbitration is wrong.  (Doc. 15 p. 25).  In the context of deciding the arbitrability of a dispute between an employer and union, the only presumption favoring arbitration comes from the *Steelworkers Trilogy*, establishing the four principles to be applied in analyzing arbitrability, with the last being a rebuttable presumption for arbitration.  APM has demonstrated below the reasons the rebuttable presumption under the *Steelworkers Trilogy* does not apply.  But, to be clear, in responding to Local 1410's arguments concerning the so-called "presumption" pursuant to federal labor policy, APM patently disputes that federal labor policy favors or includes a presumption favoring arbitration.

15

conditions to seeking monetary damages because the CBA unequivocally confirms that they did not. While the District Court properly determined applying the rebuttable presumption favoring arbitration was neither necessary nor permissible, even if the presumption is applied, APM sufficiently rebutted the presumption, and its suit must proceed in the District Court.

Clinging to federal labor policy, an isolated reading of Article 5, and a self-serving interpretation of Article 4, Local 1410's principal Brief attempts to manufacture errors in the District Court's Order. For the reasons outlined herein, Local 1410's attempts fail and must be rejected. The simple fact is APM did not agree to grieve and arbitrate its claims alleging violations of Article 4, including the conditions identified in Article 4(a)-(c), prior to filing suit. APM respectfully submits that nothing in the LMRA, applicable precedent, or the CBA permitted the District Court to rewrite the provisions at issue by applying Article 5's broad, but qualified, language into the specific and crystal clear provisions in Article 4. Doing so would not only violate settled law, but it would also completely thwart APM's bargained-for rights, obligations, and expectations under the unambiguous CBA. Assuming this Court finds a proper jurisdictional basis to even consider the merits of Local 1410's premature appeal, the District Court's Order should be affirmed and this case remanded for further proceedings in the District Court.

16

# V.    ARGUMENT

A.    **The District Court Properly Refused to Apply the "Presumption" Favoring Arbitration because the CBA Is Unambiguous and Moreover, the LMRA and Federal Labor Policy Only "Favor" Settling Disputes through the Method Agreed to by the Parties.**

Contrary to Local 1410's assertions, the LMRA is a statute of negotiation, not arbitration.  Under the LMRA, disputes regarding or arising out of the application or interpretation of CBA provisions should be resolved "by **a method** agreed upon by the parties." 29 U.S.C.A. § 173(d) (emphasis added).  Neither the LMRA nor federal labor policy mandate that parties to a CBA employ a grievance and arbitration procedure as their chosen method to resolve disputes.  They certainly do not forbid the parties from negotiating and agreeing to a different dispute resolution procedure, such as litigation, in limited or all circumstances.  In other words, the LMRA and federal labor policy only "strongly favor[]" enforcing CBA language as unambiguously written and agreed to by the parties, and the applicable statutory framework and judicial precedent does not, in any way, allow a court to disregard express CBA language providing for non-arbitral dispute resolution and compel arbitration for the sole sake of federal labor policy.  (*See* Doc. 15 p. 25 (incorrectly arguing that "[i]t is well-settled that federal labor policy strongly favors settling disputes through the grievance and arbitration procedure.")).

Throughout its Brief, Local 1410 relies on cherry-picked case quotations and citations to support its misguided application of the *Steelworkers Trilogy* analysis,

which controls arbitrability decisions.  (Doc. 15 pp. 25 – 27).  Local 1410's Brief omits three of the four principles applicable to the analysis, and instead, only focuses on the fourth principle: the presumption in favor of arbitration.  (*Id.*).  As it urged the District Court, Local 1410 would have this Court reach the flawed conclusion that arbitration should be compelled in every dispute involving the mere presence of a grievance and arbitration provision, regardless of other CBA provisions containing non-arbitral dispute resolution methods.  (Doc. 15 pp. 25 – 27).  However, the District Court's Order fully outlines and properly follows the Supreme Court's recount of the *Steelworkers Trilogy* principles, which APM has summarized below.  *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986); (Doc. 16 pp. 258 – 259).

First, Local 1410's argument that federal labor policy favoring arbitration requires application of the arbitration presumption is incorrect because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit."  *Id.* at 648.  Second, "[u]nless the parties clearly and unmistakably provide otherwise," the arbitrability of a particular dispute is reserved for judicial determination.[5]  *Id.* at 649.  Last, if a CBA contains

---

[5]     As the District Court's Order confirms, the parties agree principles two and three of the *Steelworkers Trilogy* are not at issue.  (Doc. 16 p. 259 n.2).  Both parties acknowledged based on the CBA, the issue of arbitrability (the second principle) is an issue for the Court, not the arbitrator, and also agreed arbitrability should be

an arbitration clause, "there is a presumption of arbitrability… unless it may be said

with positive assurance that the arbitration clause is not susceptible to an

interpretation that covers the asserted dispute." *Id.* at 650.

> With the first and fourth principles in mind:
>
> Except where the CBA language clearly and unmistakably provide[s] otherwise, it is **the court's duty to interpret the agreement** and to determine whether the parties **intended to arbitrate grievances concerning a particular matter**. They then discharge this duty by: (1) applying the presumption of arbitrability **only where** a validly formed and enforceable arbitration agreement **is ambiguous** about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration **only where the presumption is not rebutted**.

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010) (citing *AT&T*

*Techs., Inc.* 475 U.S. at 649, 651-52) (emphasis added) (internal quotation marks

and other citations omitted).   Thus, Local 1410 "is wrong to suggest that the

presumption of arbitrability [the Supreme Court] sometimes appl[ies] takes courts

outside [the Supreme Court's] settled framework for deciding arbitrability...." *Id.* at

302.   Local 1410 also incorrectly suggests "that this policy overrides the principle

that a court may submit to arbitration only those disputes… that the parties have

agreed to submit." *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S.

938, 943 (1995) (internal quotation marks omitted).

---

decided without considering the merits of the underlying claims (the third principle). (*Id.*)

19

Therefore, the District Court's first duty was to first interpret the language in the CBA to determine whether APM agreed to arbitrate disputes regarding alleged violations of the no-strike provision. The District Court did so and determined the CBA expressly and unambiguously creates an exception allowing APM to seek relief in court for Local 1410's alleged Article 4 violation. (Doc. 16 pp. 258 – 263). As such, the District Court appropriately refrained from applying the presumption favoring arbitration. (*Id.*).

**B.    The District Court Correctly Applied the First *Steelworkers Trilogy* Principle and Appropriately Rejected Local 1410's Unreasonable CBA Interpretation.**

**1.    Based on the plain language of the CBA, APM's claims and the Article 4 conditions are not subject to the Article 5 grievance and arbitration procedure.**

On appeal, Local 1410 concedes that Article 4 creates an express exception to Article 5's mandatory grievance and arbitration procedure, permitting APM to seek immediate injunctive relief in court. (Doc. 15 pp. 27, 34). Local 1410 also abandons its initial argument that for APM's claims seeking damages, APM first must arbitrate the merits and may only proceed to court after an arbitrator determines Local 1410 actually violated the no-strike provision. (Doc. 16 pp. 193 – 198; 236 – 238). Thus, with respect to the first *Steelworkers Trilogy* principle, Local 1410's only remaining argument is that the parties intended to grieve and arbitrate whether the three conditions in Article 4(a)-(c) have been satisfied. (Doc. 15 pp. 27 – 37). According

to Local 1410, APM's suit would only be authorized after the arbitrator determines the conditions were fulfilled. (*Id.*). This far-fetched and impractical argument not only writes-in an additional requirement into Article 4(a)-(c), but it also requires wholly ignoring the context provided by other CBA provisions evincing the parties' clear intent to limit the scope of and exclude Article 4 disputes from the dispute resolution procedures in Article 5.

In satisfying the first *Steelworkers Trilogy* principle (e.g., interpret the CBA language and determine the parties' intent), the Supreme Court has instructed district courts should apply the ordinary principles of contract construction. *See Granite Rock*, 561 U.S. at 296; *First Options*, 514 U.S. at 944. (*See also* Doc. 16 pp. 260 – 262). Here, the District Court interpreted the CBA as a whole, giving appropriate weight to Article 4's specific provisions, and accurately concluded, "the remedies provision in Article IV authorizing judicial relief provides an exception to the Arbitration provision in Article V, permitting not only claims for injunctive relief but also claims for monetary damages to proceed in court." (Doc. 16 p. 262). The District Court rejected Local 1410's proffered interpretation as far too unreasonable to manifest any intent by the parties to grieve and arbitrate the three Article 4 conditions to filing suit for monetary damages. (Doc. 16 p. 262). For the reasons outlined below, the District Court's ruling should be affirmed.

First, the plain language in Article 4 belies any conclusion that the parties intended to grieve and arbitrate the conditions inasmuch as APM may initiate a judicial action for damages for conduct "which [APM] ***asserts*** is a violation of this Article." (Doc. 16 pp. 118 – 119). This plain language neither requires an arbitrator to find an actual Article 4 violation nor supports the contention that APM must submit or establish the occurrence of any condition to an arbitrator prior to filing suit. Second, had the parties intended to grieve and arbitrate the satisfaction of the conditions, the parties certainly would have included compliance with the Article 5 procedure as an enumerated condition in Article 4(a)-(c), yet no such language or any indication of Article 5 applicability exists. Additionally, Local 1410's assertions that Article 5's broad language automatically subjects the Article 4 conditions to the grievance and arbitration procedure is further dispelled by numerous other CBA provisions in which the parties expressly identified the disputes that are "subject to **Article 5, "Disputes and Arbitration."** (*See* Doc. 16 pp. 128, 145, 150 – 151, 155). If the parties intended Article 5 to be as broad and all-inclusive as Local 1410 contends, there simply was no need to expressly identify the disputes that fall under the Article 5 umbrella. The references identifying the disputes subject to the Article 5 procedures are included throughout the CBA, yet no such references are included in Article 4 addressing the narrower category of disputes that may be litigated in court. No other language exists to even suggest that the Article 4 conditions are or

22

were intended to be "subject to **Article 5, 'Disputes and Arbitration.' "** Last, as the District Court noted, requiring the parties to grieve and arbitrate the conditions based on Article 5's "broad" language would render the Article 4 exclusions and related conditions entirely meaningless. (Doc. 16 p. 262). If Article 5 applied at all, much less in blanket fashion, the parties would not have outlined a separate, alternative dispute resolution method for alleged Article 4 violations. *See, e.g.*, *Romano,* 120 F.4th at 742.

The applicable rules of construction required the District Court to: (i) read Article 4 and 5 in the context of the entire CBA; (ii) find the specific provisions in Article 4 control over the more general terms in Article 5 and elsewhere in the CBA; and (iii) to favor "an interpretation which gives a reasonable, lawful and effective meaning to all terms" of the CBA over "an interpretation which leaves a part unreasonable, unlawful, or of no effect." (Doc. 16 pp. 260 – 261 (internal quotations and citations removed)). The District Court's analysis of the CBA correctly applied the above rules and correctly determined that the parties intended to create an alternative, fast-action dispute resolution method for disputes alleging prohibited strike and lockout activity.[6]

---

[6]    This intent and express contract language is bolstered by the fact that work stoppages are emergency situations for employers like APM, and the CBA otherwise does not provide APM an opportunity for exigent dispute resolution. In contrast, for disputes not alleging violations of the no-strike provision subject to Article 5, Local

For the reasons outlined above, the Court should affirm the District Court's decision and order that APM's claims may proceed in court.

### 2.     Local 1410's arguments on appeal neither change the analysis nor require a different result.

Local 1410's attempt to invent alleged errors by the District Court is unavailing. (Doc. 15 pp. 27 – 37). Nonetheless, APM has addressed each of Local 1410's arguments in pages 27 – 37 of its Brief below by corresponding paragraph numbers.

1.     In direct contravention to the Supreme Court's directive that the CBA must be interpreted in its full context, Local 1410 argues the District Court failed to take "the first, and necessary step" of deciding whether Article 5 excludes APM's suit from the grievance and arbitration provision. (Doc. 15 pp. 27 – 29). In reality, isolating the Article 5 procedure and compelling arbitration while ignoring the remaining and more specific provisions in Article 4 would have been reversible error. (*See, supra¸* at § V(A) pp. 17 – 20). Local 1410's citation to *Freidrich* is equally unpersuasive because APM has never argued that it did not have an opportunity to submit its dispute to the grievance and arbitration procedure. (Doc. 15 p. 29 (citing *Freidrich v. Local Union No. 780, IUE-AFL-CIO-CLC,* 515 F.2d 225 (5th Cir. 1975)). Rather, APM's position has always been and continues to be

---

1410 and its members are entitled to an expedited hearing procedure for time-sensitive matters. (Doc. 16 p. 120).

that Article 4 provided APM the option to either satisfy the conditions and file suit or submit the dispute as a grievance under Article 5. That APM exercised its contractual right and chose the former does not require reversal.

2.    Next, relying on a self-serving and strained interpretation of the parties' intent, Local 1410's Brief points to the distinction in Article 4 between injunctive and monetary relief, emphasizing that the conditions to filing a judicial action apply only to claims for monetary relief. (Doc. 15 pp. 29 – 31). According to Local 1410, that distinction somehow supports the parties intended to make the conditions for seeking monetary relief subject to the grievance and arbitration procedure and establishes reversible error. (Doc. 15 p. 31). Local 1410's Brief offers no logical explanation to support or even suggest that the additional conditions applicable to claims for monetary relief (i) evince the parties' intent to arbitrate the conditions; or (ii) illustrate error by the District Court. Neither point is accurate, and as discussed further below, the distinction Local 1410 emphasizes in its Brief, and the reasons for the distinction, in no way suggest an intent to make the issue of satisfying the conditions subject to mandatory arbitration.

It is hornbook procedure that injunctive relief requires a showing of imminent irreparable harm for which no other legal remedy exists. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1286 (11th Cir. 1990). If a party does not "immediately" file for injunctive relief, its

25

ability to make the required showing and/or avoid mootness dwindles by the day. To that end, pursuant to Fed. R. Civ. P. 65, notice or attempted notice to the defendant and posting a security bond are the only procedural conditions for seeking emergency injunctive relief. Making the additional conditions in 4(b) and (c) apply to claims for injunctive relief would exceed the legal requirements under Rule 65 and otherwise be inconsistent with the emergency and time-sensitive nature of circumstances justifying injunctive remedies. *See* Fed. R. Civ. P. 65(b)(1)(B); Ala. R. Civ. P. 65(b)(2). Article 4's distinction between the two different forms of relief does nothing more than memorialize the legal difference between and bases for injunctive and monetary relief. It certainly does not evince any intent to treat claims for injunctive relief and claims for monetary relief differently in terms of applying Article 5 to one and not the other. That is especially true considering the exclusionary language in Article 4 ensuring claims for either form of relief may be filed in court.

Additionally, Local 1410's argument is contradictory and makes little sense. At the outset, the three conditions merely establish the parties' intent to require completing basic prerequisites (e.g., notice, opportunity to investigate, and ceasing any misconduct) prior to initiating litigation. Once the prerequisites have been attempted, nothing prevents the complaining party from seeking judicial relief and damages. The language at issue certainly does not require an arbitrator's

determination that the conditions have been satisfied prior to filing suit, and any contrary interpretation would eviscerate the purpose and intent of the exception to the grievance and arbitration procedure created by Article 4.  Local 1410's concessions only highlight the inconsistency and lack of support for its interpretation.  In fact, much like the language in Article 4 addressing claims for injunctive relief, the language addressing claims for monetary relief does not hint at, much less expressly reference, Article 5.  Considering that, Local 1410 reasonably concedes the parties intended that Article 4 exclude from the mandatory arbitration provision in Article 5 claims seeking injunctive relief for alleged violations arising under Article 4.  Yet, in the next breath, Local 1410 urges that by adding the three rudimentary conditions for pursuing monetary relief, the parties must have intended to make satisfying the conditions subject to the Article 5 grievance and arbitration procedures.  (Doc. 15 pp. 29 – 33).  There is no language in Article 4 or anywhere else in the CBA to support Local 1410's interpretation.

Given the parties' crystal clear intent to create an alternative dispute resolution system for alleged Article 4 violations, as Local 1410 acknowledges (in part), the two sections are not inconsistent, and there is no need to "reconcile" the Article 4 dispute resolution procedure with that of Article 5.

3.    Unlike the contract language at issue in *United Steelworkers of Am., AFL-CIO-CLC v. Lukens Steel Co.*, the express exclusions outlined in Article 4 are

not subject to two **reasonable** interpretations.  969 F.2d 1468, 1476 (3d Cir. 1992) (explaining agreement's language was equally consistent with both parties' interpretations and rejecting invitation to depart from the arbitration clause in light of the ambiguity).  Indeed, the CBA does not require the Court to make any assumptions regarding the parties' intent as the "parties clearly and unambiguously described" the precise disputes that warrant judicial recourse and the exact circumstances under which a party may seek such recourse. *Id.*  Likewise, the parties "clearly and unambiguously described" the disputes subject to Article 5 procedure. While Local 1410 clearly would have preferred to grieve and arbitrate APM's dispute, that does not change the express exclusionary language in Article 4.  It also has no impact on the glaring fact that the strike activity giving rise to APM's claim is precisely the conduct and harm the parties intended to prevent and, to the extent it occurs, to provide an efficient and adequate means to redress.  As the District Court determined, this was the obvious intent in crafting the exclusionary language in Article 4 for claims based on alleged violations of the no-strike provision.  (Doc. 16 p. 262).

4.    The District Court fulfilled its obligation to interpret the CBA under the first principle in the *Steelworkers Trilogy*.  In doing so, the District Court was tasked with evaluating the reasonableness of the parties' respective interpretations and determining whether an ambiguity existed that warranted application of the

arbitration presumption.  While Local 1410's Brief suggests otherwise (Doc. 15 p. 35), at no point did APM argue or the District Court conclude that the parties' interests in efficiency served as a basis for denying Local 1410's Motion.  To the contrary, APM's arguments and the District Court's analysis focused on the unambiguous nature of the language in Article 4 and the reasonableness of Local 1410's proposed interpretation.  (Doc. 16 pp. 219 – 222; 262).  The only mention of efficiency was in considering and rejecting the reasonableness of Local 1410's proposed interpretation of the CBA provisions – not that the inefficient procedure was negotiated by the parties or indicative of the parties' intent.  (Doc. 16 p. 262). In fact, the District Court noted the cumbersome, protracted, and illogical result that Local 1410's interpretation would yield and also determined it was inconsistent with the parties' overarching intent as evident from the language in Article 4 and throughout the CBA.  (Doc. 16 p. 262; District Court Doc. 33 p. 36:4 – 22).  Local 1410's reliance on cases addressing "pendant arbitrable claims" is misplaced.  (Doc. 15 p. 35).  Since APM's claims are not arbitrable, precedent regarding pendant arbitrable claims is inapposite.  Finally, neither the CBA language nor the arguments asserted in Local 1410's Brief support its interpretation, and though "grievance machinery" is central to CBAs, the instant CBA unquestionably  provides that Article 5 is neither the sole method for resolving Article 4 disputes nor applicable to the Article 4 conditions to filing suit.

5.    When examining CBA language similar to Article 4, other courts have reached the same conclusion as the District Court irrespective of "broad" language in the various grievance and arbitration provisions.  Indeed, the Third Circuit held that the qualification that " 'nothing in this agreement shall prevent' application to a court of competent jurisdiction" took away the mandatory aspect of the grievance and arbitration provision, making arbitration optional.  *Indep. Oil Workers at Paulsboro, N.J. v. Mobil Oil Corp.*, 441 F.2d 651, 653 (3d Cir. 1971).  *See also Pueblo of Isleta v. Grisham*, 2019 WL 1429586 at *16 (D.N.M Mar. 30, 2019) ("[The escape clause] and [i]ts broad language expressly preserves, wholly intact, the parties' right to pursue remedies other than arbitration.… **The Court would necessarily nullify this subsection if it were to hold that [the grievance procedure] makes arbitration mandatory**.") (emphasis added).

The main difference in the CBA at issue here and in the above-cited cases is the three conditions precedent to filing suit.  That is a distinction without a difference.  Missing from Article 4 is any language to reasonably support an intent to grieve and arbitrate satisfaction of the conditions before filing suit.  Local 1410's cited case law does not help its arguments.  (*See* Doc. 15 at pp. 36 – 37 (citing *Pilot Freight Carriers Inc. v. Local 391, IBT,* 659 F.2d 1252 (4th Cir. 1981)).  First, as

30

outlined below, *Pilot Freight* is inapposite based on the CBA language at issue. Second, the Fourth Circuit's analysis actually illustrates APM's point.[7]

The CBA language in *Pilot Freight* included a broad arbitration provision that applied to all grievances or questions of interpretation, including, specifically, disputes over unauthorized strikes.  *Id.* at 1255.  The parties disputed whether an unauthorized strike actually occurred, but according to the employer, the strike was authorized.  *Id*. at 1256.  Also according to the employer, since the grievance and arbitration procedure only addressed "unauthorized" strikes, without mentioning "authorized" strikes, disputes over authorized strikes were "by implication excluded from arbitration."  *Id*.  In considering and rejecting the employer's "exclusion by implication" argument, the Fourth Circuit, quoting from *Warrior & Gulf Nav. Co.*, emphasized, " 'the absence of an express provision' " in the CBA that excluded disputes over authorized strikes from arbitration.  *Id.* (quoting *United Steelworkers v. Warrior & Gulf Nav. Co*., 363 U.S. 574, 582 (1960)).  Ultimately, the Fourth Circuit determined whether the dispute was subject to the grievance and arbitration

---

[7]    With respect to APM's jurisdictional challenge and pending Motion to Dismiss, it is worth noting that the *Pilot Freight* union filed an immediate, interlocutory appeal of the district court's denial of its motion to dismiss or to stay pending arbitration, but the Fourth Circuit dismissed the appeal and denied the union's motion for writ of mandamus. *Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, No. 77-1704, 1977 WL 27517 (4th Cir. Sept. 2, 1977).  The Fourth Circuit did not hear the appeal or reverse the district court's decision until after the jury's verdict for Pilot Freight (e.g., a final decision). *Pilot Freight*, 659 F.2d at 1254.

procedure involved mixed questions of fact and contract interpretation concerning whether an authorized strike occurred, requiring the district court to make a merits determination (e.g., run afoul of the third *Steelworkers Trilogy* principle).  *Id*. at 1256 – 57, 1259 ("When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreement, it usurps a function which under that regime is entrusted to the arbitration tribunal.") (citation omitted).  Since the district court could not determine arbitrability without reaching the merits of whether the strike was authorized or unauthorized, the Fourth Circuit held the employer's claims were subject to the CBA's arbitration provision.  *Id.* at 1257.

There are obvious distinctions between the *Pilot Freight* CBA language and the CBA language at issue here.  Most glaringly, the instant CBA ***does*** include express language excluding from the arbitration procedure disputes that "either party **asserts**" is an "**alleged** violation" of the no-strike provision in Article 4.  As such, the Fourth Circuit's concern about the absence of express exclusionary language and using "exclusion by implication" to infer the parties' intent does not apply.  Equally fatal to Local 1410's *Pilot Freight* arguments, is that the express language in the parties' CBA also does not include language requiring a prior determination or factual finding concerning whether a strike occurred or whether the three conditions in Article 4(a)-(c) actually have been satisfied.  To the contrary, the provision in

Article 4 authorizing judicial action requires only that "either party **assert**[]…an **alleged** violation of this Article [4]."  (Doc. 16 pp. 118 – 119) (emphasis added). Unlike in *Pilot Freight*, there is no requirement that an arbitrator determine the conditions were satisfied or make any other fact determination prior to filing suit. Thus, based on the unambiguous language in Article 4, the District Court did not have to reach the merits of whether a strike actually occurred and/or whether the conditions were fulfilled to determine arbitrability.  *Cf. Pilot Freight*, 659 F.3d at 1257.  APM satisfied its only obligation under Article 4 by plausibly pleading an alleged violation of Article 4 and satisfaction of the conditions precedent in its Amended Complaint.  (Doc. 16 pp. 106 – 108, 114 Am.  Compl. at ¶¶ 30 – 38, 60). To the extent Local 1410 disagrees, it is free to deny the allegation in its Answer and/or in a dispositive motion filed with the District Court.

Based on the above, *Pilot Freight* is so factually distinguishable it does not help Local 1410's argument.  In fact, the *Pilot Freight* analysis illustrates APM's point.  As can be gleaned from the Fourth Circuit's analysis, it is the parties' consent to arbitrating a particular dispute, as evidenced by the specific contractual language, that controls.  *See id*. at 1256-57.  As the District Court appropriately determined, there is no way to accept Local 1410's interpretation of the CBA while also giving effect to the parties' intent as stated in the exclusionary language contained in Article 4.                                                                                                  In

sum, Local 1410's continued attempt to rewrite the CBA by injecting into Article 4 the broader provisions applicable to all other disputes under Article 5 should be rejected. Respectfully, this Court should permit APM's claims to proceed in APM's chosen forum, as the parties contemplated and expressly authorized in the CBA, by affirming the District Court's Order.

## C. The District Court Correctly Declined to Apply the Presumption Favoring Arbitration, but Even If It Is Applied, the Presumption Has Sufficiently Been Rebutted.

As established, *supra,* at § V(A), the District Court first was obligated to interpret the plain CBA language, and the District Court had an obligation to apply the presumption if, and only if, it found such language to be ambiguous regarding the parties' intent to arbitrate the instant dispute. The District Court properly rejected Local 1410's repeated invitation to apply the presumption outright or to otherwise allow the presumption to frame its interpretation of Article 4's express exclusions, carving out the disputes that would not be subject to the mandatory arbitration provision in Article 5. Moreover, the District Court justifiably rejected Local 1410's proposed interpretations and determined the parties intended to provide an option to resolve Article 4 disputes in court. Both decisions were correct and are supported for the reasons already explained, and whether the District Court erred in refusing to apply the presumption should not require further analysis. Nonetheless, and to be sure, APM has addressed below each of Local 1410's arguments set forth

34

in pages 38 – 46 of its Brief by corresponding paragraph numbers.

1.    This argument requires the Court to assume or find that Local 1410's CBA interpretation is reasonable.  For the numerous reasons already identified, it is not, and accordingly, Local 1410's arguments based on purported ambiguous language in the CBA fail.  Additionally, the District Court never, either expressly or inherently, concluded that the CBA language was ambiguous in any way.  (Doc. 15 p. 39).  Nothing in the Order suggests the District Court found the CBA language to be anything other than "clear, unambiguous, and capable of only one reasonable interpretation," thereby requiring the District Court strictly enforce it.  *See Kwok v. Delta Air Lines Inc.*, 578 F. App'x 898, 900 (11th Cir. 2014).   In analyzing a contractual ambiguity in *Kwok*, the Eleventh Circuit applied the longstanding principle that "[a] contract must be given a reasonable construction… rather than [one] which would… lead to an absurd result." *Id.* at 902 (citation omitted).  That the District Court relied on this logic to reject Local 1410's unreasonable interpretation and conclude the CBA is unambiguous does not require application of the presumption.  Local 1410's citation of *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054 (11th Cir. 1998) supports the overarching premise that contracts should be interpreted as a whole to determine the parties' intent.  (Doc. 15 p. 40).  As the Order explicitly states, the District Court's analysis began with emphasizing the overarching premise.  (Doc. 16 p. 261).  Likewise, as the Order correctly

35

concludes, when the CBA provisions are read in conjunction, there is no reasonable interpretation to support Local 1410's insistence that the conditions are arbitrable. (Doc. 16 p. 262).

Similarly, APM has already debunked Local 1410's contention that the grievance and arbitration procedure is "at the very heart" of the collective bargaining process. (Doc. 15 p. 41). That is only true to the extent that grievance and arbitration is the dispute resolution procedure to which the parties agreed. With respect to APM's claim alleging prohibited strike activity, APM did not agree the grievance and arbitration procedure would be the sole or mandatory process for resolving its claim. The District Court did not err in interpreting the plain language at issue in the context of party agreement as required under the LMRA and controlling precedent.

2. Local 1410's Brief again mischaracterizes the Order, and APM reiterates that the District Court never concluded the CBA was ambiguous. As such, and again, application of the presumption would have been wholly improper. Local 1410's case law (Doc. 15 pp. 42 – 44) supporting application of the presumption where the CBA language at issue was subject to two ***reasonable*** interpretations is inapplicable and utterly unhelpful to the current analysis. As Local 1410 agrees, in the labor context, it is neither uncommon nor unusual for the parties to exclude from the mandatory grievance and arbitration procedure, claims for violating a no-strike

provision. (Doc. 15 p. 44). That is precisely what the parties' CBA accomplishes, and Article 4 expressly and unambiguously creates an alternative procedure for resolving disputes alleging violations the no-strike provision in Article 4. Local 1410's citation of *ITT World Commc'ns, Inc. v. Commc'ns Workers of Am.*, 422 F.2d 77, 81 – 82 (2d Cir. 1970) once again points to authority that is inapposite based on CBA language that is entirely different from the instant CBA. Indeed, *ITT World Commc'ns*, where the parties expressly excluded certain disputes from the arbitration provision but not disputes asserting violations of the no-strike provision, is easily distinguishable from the provisions in the parties' CBA, expressly identifying the disputes that are included in and subject to the Article 5 procedure and those that are not.[8]

3.      Finally, even assuming, *arguendo*, that the presumption favoring arbitration applies (it does not), the presumption has been sufficiently rebutted.[9] The CBA and APM's analysis of the applicable contract language is inherently "forceful evidence" that the parties intended to create a separate dispute resolution option

---

[8]      *Drake Bakeries, Inc. v. Lock 50, Am. Bakery & Confectionery Workers Int'l, AFL-CIO*, 370 U.S. 254 (1962) also is inapposite because the CBA did not contain any language whatsoever even potentially excluding breach of the no-strike provision from the grievance and arbitration procedure. *Id.* at 258-59.

[9]      Since the District Court correctly determined the rebuttable presumption did not apply, it did not reach the issue of whether APM rebutted the presumption. However, this Court properly may affirm for any reason supported by the record. *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356 (11th Cir. 2018).

(judicial action) for alleged violations of Article 4. As APM argued to the District Court and respectfully submits now, the only sensible interpretation of the CBA giving effect to the provisions in both Articles 4 and 5, while avoiding an illogical and absurd result, is that the exclusionary language in Article 4 manifests the parties' intent to bypass Article 5 where either party alleges (i) an alleged violation of the no-strike provision; and (ii) that the Article 4 conditions have been satisfied. Should the Court apply the presumption, APM has met its burden to rebut it by eliminating any doubt whether APM's interpretation is the only reasonable reading of the CBA. For the reasons outlined herein, APM's arguments and evidence of the parties' intent in drafting the CBA provisions at issue sufficiently rebuts the presumption.

## VI.  CONCLUSION

Based on the foregoing, APM respectfully submits that: (1) the Court should summarily dismiss Local 1410's procedurally improper interlocutory appeal; and, alternatively, (2) assuming the Court exercises jurisdiction, the Court should affirm the District Court's Order and remand the case with instructions that APM's claims shall proceed in the District Court.

Respectfully submitted this 14th day of February, 2024,

*/s/ Anne Laurie McClurkin*
Anne Laurie McClurkin
Mary Anna Brand
MAYNARD NEXSEN PC
RSA Battle House Tower
11 North Water Street, Suite 24290
Mobile, Alabama 36602
Telephone: (251) 432-0001
Email: amcclurkin@maynardnexsen.com
       mbrand@maynardnexsen.com

**Attorneys for Appellee APM Terminals Mobile, LLC**

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. Rule 32, the undersigned counsel for Appellee certifies that the foregoing complies with the type-volume and typeface requirements of Fed. R. App. P. 28.1(e)(2) and 32(a)(5-6).

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A) because it contains 9,267 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font on Microsoft Word 2016.

Date: February 14, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2025, I filed the foregoing using the Court's CM/ECF system which automatically will serve a copy on all counsel of record.

*/s/ Anne Laurie McClurkin*